DECISION
Before the Court are three motions: Motion for a New Trial, Motion to Alter/Amend Judgment, and Renewed Motion for Judgment as a Matter of Law brought by Defendants following an adverse jury verdict in the underlying medical malpractice action. Jurisdiction is pursuant to Super. Ct. R. Civ. P. 59.
 Facts and Travel
The present motions arise out of the suit of Plaintiff Stella Youngsaye ("Mrs. Youngsaye"), alleging medical malpractice by two physicians treating her in 2000. In February 2000, during a routine appointment with her primary physician, Dr. Frank D'Allesandro, which included a urinalysis, Mrs. Youngsaye was found to have blood and protein in her urine. A second urinalysis two months later again returned these abnormal results, and Mrs. Youngsaye was referred by her primary physician to a urologist.
Mrs. Youngsaye then visited Dr. Jacques Susset ("Defendant"). A urinalysis performed during Mrs. Youngsaye's first visit with Dr. Susset, on May 30, 2000, again found hematuria — blood in the urine. This finding was replicated in urinalyses performed *Page 2 
at each subsequent visit: on June 6th July 3rd, and July 24th of 2000. Despite these findings, Dr. Susset did not order a blood test because, according to his trial testimony, he assumed the referring doctor would have done so and would have reported any abnormal results. Dr. Susset did not, however, verify these assumptions by communicating with Plaintiff's primary physician. Dr. Susset did not believe tests for kidney function were indicated and did not order any. On July 27, 2000, Mrs. Youngsaye returned to Dr. D'Allesandro, her primary physician, with complaints of nausea and weight loss. Dr. D'Allesandro ordered a series of tests, and the results received a few days later indicated anemia, high BUN levels, and abnormal creatinine levels. He immediately ordered hospital treatment. Plaintiff subsequently went into renal failure and underwent dialysis for kidney disease; she later received a kidney transplant.
In her subsequent action for medical malpractice, Mrs. Youngsaye alleged the care provided by both Dr. D'Allesandro and Dr. Susset had been negligent. Following a jury trial, a verdict was returned on March 30, 2007 in Dr. D'Alessandro's favor. That finding of no liability is not before the Court in the present motions. The jury additionally denied a claim for loss of consortium made by Mrs. Youngsaye's husband, Ronald Youngsaye, a verdict likewise not challenged in the present motions. The jury did find, however, that Mrs. Youngsaye had shown that Dr. Susset had been negligent and proximately caused her injuries, and awarded Mrs. Youngsaye $500,000 in damages. The Court then entered judgment in this amount, plus statutory interest under G.L. 1956 §9-21-10.
Defendants now move this Court for a new trial, assigning error to two rulings of the Court during trial. First, Defendants allege that the Court erroneously denied their *Page 3 
request for additional cross-examination of Plaintiffs' expert witness to address his testimony referencing medical literature that had not been disclosed to Defendants during discovery. Second, Defendants argue that jury instructions on the issue of spoliation were in error and invaded the role of the jury. Additionally, Defendants move to alter or amend the judgment because of an alleged constitutional infirmity in the state's prejudgment interest statute. Finally, Defendants, renewing a previous motion denied by this Court, move for judgment as a matter of law.
 Law and Analysis
Rule 59(a) of the Rhode Island Superior Court Rules of Civil Procedure allows, in pertinent part, that "[a] new trial may be granted . . . for error of law occurring at the trial." When faced with a Motion for a New Trial based on a claim of insufficient evidence, the trial justice acts as a "super juror" who "independently weigh[s], evaluate[s], and assess[es] the credibility of the trial witnesses and evidence."Martinelli v. Hopkins, 787 A.2d 1158, 1165 (R.I. 2001) (quotingGraff v. Motta, 748 A.2d 249, 255 (R.I. 2000)). If the evidence is evenly balanced or otherwise allows differing conclusions among reasonable minds, the verdict should stand and the motion should be denied. Id.
 I. The Expert Testimony of Dr. Gelman
Defendants argue that Dr.Gelman, an expert witness called by Plaintiffs, offered opinions that were based, at least in part, on medical research and literature that were not disclosed in response to Defendants' pre-trial interrogatory, and not subjected to scrutiny through cross-examination at trial. Dr. Gelman testified that Dr. Susset's failure to refer Mrs. Youngsaye to a nephrologist based on the tests he performed was a deviation from the standard of care owed. Dr. Gelman further testified that an earlier referral would *Page 4 
have resulted in earlier treatment and an improved prognosis for Mrs. Youngsaye's kidney disease, including prevention of renal failure and the need for a transplant. Defendants objected to much of this testimony at trial, arguing that it was based on medical literature that, despite their pretrial interrogatory pursuant to the Superior Court Rules of Civil Procedure, had not been disclosed. Defendants asked that the Court order an additional day of cross-examination after Defendants reviewed literature collected by Dr. Gelman. Defendants now argue that the Court's denial of that request, resulting in the presentation of Dr. Gelman's opinions to the jury, without prior disclosure or trial scrutiny of its alleged bases, failed to provide Defendants a fair defense and requires a new trial.
When a party seeks to offer expert opinion testimony at trial, this Court acts as "gatekeeper," filtering such proferred evidence and allowing only qualified experts to present only reliable and relevant opinions to the jury. State v. Gough, 810 A.2d 783, 785 (R.I. 2002) (citing Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd., 772 A.2d 1056
(R.I. 2001); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
(1993)). The admissibility of expert testimony is a matter "in the sound discretion of the trial justice and will not be disturbed absent a showing of an abuse of that discretion." Id. (quoting Graff,748 A.2d at 252). "Prime considerations in determining whether a witness is qualified include evidence of the witness's education, training, employment, or prior experiences." State v. Villani, 491 A.2d 976, 979
(R.I. 1985).
In addition to the substantive tests of reliability and relevancy, a party intending to offer expert testimony must comply with procedural rules. An opposing party is entitled to learn, during pretrial discovery, the content of and grounds for the opinions to be *Page 5 
offered. Super. R. Civ P. 26(b)(4)(A). Where such disclosure is made, a continuing obligation exists to supplement responses so as to maintain full disclosure. Id. Rule 33(c). This continuing obligation to disclose is intended to prevent "trial by ambush" and ensure cases are tried based on their merits. Neri v. Nationwide Mut. Fire Ins. Co.,719 A.2d 1150, 1152 (R.I. 1998). If Rule 33(c) is violated, the Court may, as the most drastic of sanctions, exclude the expert's testimony entirely where prejudice would clearly result. Id. Upon appellate review of a trial where expert testimony was presented in alleged violation of Rule 33(c), the question is whether any error was harmless, "consider[ing] such factors as the importance of the witness's testimony, the question of whether the testimony was cumulative, the presence or absence of corroboration or contradiction of the testimony, the extent of cross-examination otherwise permitted, and the overall strength of the case." Id. at 1153 (quoting New England Telephone Telegraph Co. v.Clark, 624 A.2d 298, 303-04 (R.I. 1993)).
In this case, Defendants do not contest that Dr. Gelman is a trained and experienced nephrologist and specialist in diseases of the kidney. They argue, however, that his testimony was not based solely on this experience and training, but also on medical literature that was not disclosed during pre-trial discovery. This lack of disclosure and ensuing inability to cross-examine Dr. Gelman as to the literature, Defendants further argue, resulted in prejudice and warrants granting of the new trial motion.
In support of their argument, Defendants advert to several instances during Dr. Gelman's testimony wherein he mentioned "articles," "literature," or "studies." Whenever such references were made during direct examination, however, Defendants *Page 6 
objected and prevented testimony regarding medical literature from reaching the jury. Counsel for Plaintiffs then rephrased queries so as to seek opinions based on Dr. Gelman's training and experience. Studies and medical literature were discussed more extensively during cross-examination. For example, Dr. Gelman was asked on cross-examination, "[w]hat study can you point to that specifically says that 50 percent of women with essential hematuria have glomeruloneprhitis." (Tr. 579:10-13.) Dr. Gelman then referred to an article retrieved from an on-line database, "UpToDate," and read from a page of the article in support of his conclusion. More generally, Defendants object to an entire binder of literature Dr. Gelman carried to the witness stand. He testified that he had compiled that collection after his deposition in order to provide support for the conclusions given at the deposition, and that Plaintiffs' counsel had placed the articles into a large binder in preparation for trial. Following two days of direct and cross examination of Dr. Gelman, Defense counsel, at a sidebar conference, sought an opportunity to review the binder and then have Dr. Gelman return for further cross-examination. The Court denied that request, which Defendants now allege was in error and necessitates a new trial.
During that sidebar conference, Defendants first raised their objection to the admission of Dr. Gelman's testimony without prior disclosure of the articles he carried and referenced; the Court overruled the objection at that time. Dr. Gelman was deemed a qualified expert witness based on his experience and training as a nephrologist. That experience and training formed the basis for the opinions he offered at trial. For example, during direct examination — after an objection from Defendants' counsel regarding mention of "studies" — the following exchange occurred: *Page 7 
 Q: Based on your training, experience, what you've learned over the years in practice from your dealing with patients, what — Let me ask you the question this way: Did the failure of Dr. Susset to refer Mrs. Youngsaye to a nephrologists as a result of what he learned on June 6th constitute a deviation from the standard of care you've discussed?
 A: Well, it certainly impacted on Mrs. Youngsaye by not being referred to a nephrologists.
 . . .
 Q: If she had been referred, would that have provided aid to her in terms of her disease?
 A: Yes.
 . . .
 Q: What is the basis for that statement? I know you started talking about the progression of the disease, but could you explain what the basis is.
 . . .
 A: . . . It's the fact that we would start therapy for this condition, and I think the response to therapy would be as I've described already.
(Tr. 241:15-242:24) (emphasis added). Earlier, Dr. Gelman testified, "I think if we had started immunosuppressive therapy early on in her disease, we'd have a very strong chance of having turned the whole process around." (Tr. 221:21-24.) It is true that this wording came only after objection was made to mention of "studies" or "literature." Nevertheless, the opinions Dr. Gelman actually offered were expressly limited to his medical training and his own experience with patients, as the emphasized language indicates. Defendants argue that Dr. Gelman's training and experience cannot suffice to support the opinions he offered in light of his own statements as to the rarity of Mrs. Youngsaye's condition. As the Court ruled at trial, however, that is an argument that goes to the credibility of the witness and can be addressed during cross-examination — and Defendants did, in fact, make that argument while cross-examining Dr. Gelman; it is not grounds for excluding his opinion once his qualification and expertise are shown.
As for Defendants' objections regarding the binder of articles Dr. Gelman carried to the witness stand and discussed during cross-examination, the Court does not find any *Page 8 
of his testimony was tainted by those references. The opinions offered during direct examination were not based on, and did not refer to, any of the articles. Therefore, they were not subject to Plaintiffs' duty to disclose under Rules 26 and 33. It was the Defendants who raised the spectre of medical literature, not the Plaintiffs. To the extent that such literature and medical studies became an issue in this case, it was one created by the Defendants, not the Plaintiffs. It was only upon cross-examination, in response to Defendants' questions that Dr. Gelman stated that articles contained in the binder supported his conclusions, and answered questions by citing specific articles. He explained that he had collected those articles only after his deposition, wherein he had given the same opinion, because of Defendants' challenge to that opinion. In light of the experience and training on which Dr. Gelman's testimony was based, and Defendants' opportunity to cross-examine with regard to that basis, the references were inconsequential. The Court, therefore, does not accept that such references, elicited by Defendants in the first instance, can form the basis for an attack on Dr. Gelman's qualified testimony. Thus, the Court's denial of the request for further cross-examination at that time was proper and does not justify granting of a new trial.
 II. Jury Instructions on Issue of Spoliation
Defendants additionally argue that a new trial is warranted due to alleged errors in the jury instructions as to the issue of spoliation. These instructions concerned certain reports and notes Dr. Susset had failed to produce during pre-trial discovery. Specifically, when asked in pre-trial discovery to produce the urinalysis reports for June 6 and July 3, Dr. Susset failed to do so and, at trial, it became clear he did not have copies of any such reports. Dr. Susset made conflicting statements regarding these urinalysis *Page 9 
reports. Testifying at trial on March 21, 2007, he stated that a technician, Isabella Endino, was responsible for preparing a report and should have done so for each of the four urinalyses done on Mrs. Youngsaye. Dr. Susset testified, however, that he did not recall if Ms. Endino was present and prepared a report for each of Mrs. Youngsaye's visits. Shown his prior deposition testimony wherein he had stated that he did, in fact, recall Ms. Endino being present and preparing a report for each visit, Dr. Susset retracted the deposition testimony, stating that his recollection had not been accurate. Testifying again one week later, Dr. Susset retracted his statement that a report should have been prepared for each urinalysis, stating that none would be produced if his technician were not available. Additionally, it was revealed that Defendant did not have, and could not produce, a copy of any office notes taken during Mrs. Youngsaye's July 24 visit. Dr. Susset unequivocally testified that he dictated a note for every patient visit, that he was sure he had dictated a note for Mrs. Youngsaye's July 24th visit, and that he did not know what had happened to that note.
At the close of evidence, the Court allowed the parties to submit proposed jury instructions and, at Plaintiffs' request, included the following spoliation charge based on the trial testimony regarding urinalysis reports and the office note:
 During this trial, you have heard testimony that defendant Dr. Susset has been unable to provide certain diagnostic medical reports that were requested by the plaintiffs during the course of this lawsuit.
 A jury may properly consider the issue of spoliation where a defendant, one, has failed to produce a document which the evidence tends to show was routinely generated in his business and, two, has not been able to provide a satisfactory explanation as to why the document was not prepared with respect to the incident in the case before the Court.
 Under certain circumstances, spoliation of evidence may give rise to an adverse inference that the missing or spoliated evidence would have been unfavorable to the position of the party unable to produce it. *Page 10 
 Spoliation of evidence may be innocent or intentional or somewhere in between. However, it is the unexplained negligent or deliberate absence of relevant evidence that gives rise to an inference that the missing evidence would have been unfavorable to the position of the defendant.
 A showing of bad faith is not required before the jury will be permitted to draw this inference.
 Here, Defendant Susset admitted that the reports requested by the plaintiffs are prepared in the normal course of his practice and further that he never looked in plaintiff's file to see if these reports had been prepared. As such, you may properly consider Defendant Susset's spoliation of evidence in drawing an inference that the missing reports contained evidence which would have been unfavorable to his position.
Defendants objected to this charge, arguing that no spoliation charge was warranted by the facts in this case and that, even if spoliation were relevant, the Court's instructions invaded the fact-finding province of the jury. During an in camera conference, counsel for Defendants declined the Court's suggestion that a curative instruction be given, stating that would only draw the jury's attention to the issue.
Defendants initially contend that no instructions regarding spoliation were warranted by the facts of this case. "[I]t [is] appropriate for a trial justice to give a spoliation instruction where a corporate defendant (1) failed to produce a document which the evidence tended to show was routinely generated by the corporation and (2) was unable to provide a satisfactory explanation as to why the document was not prepared with respect to the incident in the case before the court."Mead, 899 A.2d at 442-443 (citing Mead v. Papa Razzi Restaurant,840 A.2d 1103 (R.I. 2004); Kurczy v. St. Joseph Veterans Association,Inc., 820 A.2d 929, 947 (R.I. 2003)). In this case, there were numerous, ambiguous and contradictory statements in Dr. Susset's deposition and trial testimony that would support a finding by the jury that documents routinely generated in his practice were not produced and not accounted for. Thus, as the Court *Page 11 
stated during a sidebar, spoliation properly was an issue in this case, and the Court finds its inclusion of spoliation instructions did not constitute error.
In considering the content of the spoliation charge given, the Court is mindful that its review must be of the jury instructions "as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them." Mead v. PapaRazzi, 899 A.2d 437, 442 (R.I. 2006) (quoting Lieberman v. Bliss-DorisRealty Associates, L.P., 819 A.2d 666, 672 (R.I. 2003)) (internal quotation marks omitted). Review of jury instructions must not "focus on one phrase or sentence in the instructions without taking into account the context of that phrase or sentence and evaluating the instructions as a whole." Id. The reviewing Court must be mindful that jury instructions are delivered to laymen, not "a meeting of the bar association." Baccari v. Donat, 741 A.2d 262, 264 (R.I. 1999) (quotingSmith Development Corp. v. Bilow Enterprises. Inc., 112 R.I. 203, 209,308 A.2d 477, 481 (1973)). If such review shows that instructions given to the jury were erroneous, reversal is warranted "only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." Mead, 899 A.2d at 442 (quoting Hodges v.Brannon, 707 A.2d 1225, 1228 (R.I. 1998)).
Defendants argue that the Court's instruction that the jury "may properly consider Defendant Susset's spoliation of evidence" invaded the fact-finding province of the jury by stating that Dr. Susset had, in fact, spoliated evidence. In reviewing the jury instructions as a whole, the Court notes that at the beginning of its charge, the following standard instruction was given: *Page 12 
 It's the duty of the Court to decide questions of law and to instruct you in the law applicable to the case, but it is for you to apply that law to the facts of the case as you determine those facts to be. (4:14-17.)
And near the end of the jury instructions, after the spoliation charge, the Court again gave the following standard charge:
 If, during the course of this trial or in giving you these instructions, the Court has said or done anything that has caused you to believe it was indicating an opinion as to what the facts in the case are, I instruct you that the Court intended to indicate no such opinion. You should not permit such words or acts, if any, to have any influence whatever on your determination as to what the facts are. (25:8-15.)
Although Defendants did not wish to have any further cautionary instructions given, the above — reminding the jury of its fact-finding role and disavowing any suggestion otherwise — assuages any misleading effect that could have resulted from the specific phrases to which Defendants object. Additionally, in first raising spoliation, the Court used the very language given in Mead, and then, in the sentence Defendants cite, the Court instructed the jury that it "may," not that it "must," (emphasis added) consider spoliation. The jury was instructed in the beginning, middle (specifically the spoliation charge), and the end of the charge that it was for them to make the factual prerequisite findings of spoliation, and only then to draw a negative inference. Assuming arguendo, however, that one portion of one line of a 24 line spoliation charge was erroneous, the Court finds a new trial is not warranted given the extent of the spoliation charge in toto, and the several occasions where the jurors were instructed that the determination of the facts was their province and theirs alone.
In attempting to demonstrate prejudice, Defendants point to the statement in the jury instructions that, "[h]ere, Defendant Susset admitted that the reports requested by the plaintiffs are prepared in the normal course of his practice." Defendants argue that *Page 13 
because Dr. Susset retracted previous statements regarding the regularity with which these reports were made — explaining that the previous statements were the result of faulty recollection, it remained for the jury to determine whether those reports are prepared in the normal course of Dr. Susset's practice and the Court's language predetermined this factual issue. The Court's instruction, however, was accurate and objective; Dr. Susset's testimony regarding his business practice — that he transcribes an office note for each patient visit and that his technician produces urinalysis reports — was the evidentiary basis justifying a spoliation charge, and it was appropriate to instruct the jury as to why it may have considered spoliation. Even assuming, arguendo, that the jury could have believed it was being instructed to disregard Dr. Susset's retraction with respect to the urinalysis reports, the Court finds no prejudice warranting a new trial could have plausibly resulted to Defendants.
Following all the testimony and evidence of prior statements that were admitted at trial, Dr. Susset's statement that he was certain he had prepared an office visit note remained. Defendants seek to distinguish the urinalysis reports for the June 6 and July 3. With respect to those reports, the jury had before it Dr. Susset's deposition testimony that he recalled his lab technician being present and preparing the reports at issue. During trial testimony, Dr. Susset retracted this statement, saying he could not recall if his technician was present; he did, however, testify before the jury that a urinalysis report "should" have been made. Testifying one week later, he retracted this statement as well, saying a report is not always prepared because the technician may not be available. This testimony as a whole does not refute the accuracy of the Court's statement that Dr. Susset admitted that the reports are made in the regular course of his business. Dr. Susset did *Page 14 
make those admissions, and the Court's instructions did not prevent the jury from weighing his testimony in its entirety, including the disavowal of previous testimony. Defendants' argument that the jury was not allowed to consider Dr. Susset's retractions of previous statements is disingenuous. Those inconsistencies and retractions, in fact, along with the Defendant's own admissions on the witness stand, provided compelling evidence of spoliation. Dr. Susset's credibility on this topic was gravely undermined by his own testimony, which was rife with contradictory statements, and the Court is satisfied that no prejudice warranting a new trial resulted from its instructions regarding Dr. Susset's admissions. Therefore, the Court denies Defendants' Motion for a New Trial.
 III. Constitutional Challenge to Pre-Judgment Interest
In addition to assigning error to the Court's jury instructions and denial of additional cross-examination, Defendants raise a constitutional challenge to the Court's award of prejudgment interest on the whole of the jury's award, which included future damages. Defendants argue that no prejudgment interest should be awarded for the portion of the jury award that compensated Plaintiff for future damages, as those have not accrued and interest payments therefore are not necessary to make Plaintiff whole. Such an award can, therefore, only be justified as an encouragement for settlement of cases, which, Defendants argue, amounts to a burden on Defendants' right to a jury trial.
An award of interest pursuant to G.L. 1956 § 9-21-10 is "a purely ministerial act to be performed by the clerk without judicial intervention." Barbato v. Paul Revere Life Ins. Co., 794 A.2d 470,471-472 (R.I. 2002) (citing Cardi Corp. v. State, 561 A.2d 384, 387
(R.I. 1989)). The apportionment and discounting of damages to present value, on the *Page 15 
other hand, is not a "ministerial determination," but rather a factual question requiring evidentiary support. Id. at 472; see also Gardiner v.Schobel, 521 A.2d 1011 (R.I. 1987). For example, in Barbato, Defendants challenged an adverse jury award based, in part, on the argument that harms accruing after the initial breach of contract were not properly discounted to their value as of the initial breach, and that the interest added to the award from the date of breach was therefore excessive. 794 A.2d at 471. The Supreme Court agreed that Plaintiff has received "a windfall of prejudgment interest," as repeated breaches, even those nearer to the start of litigation, were credited with interest for the full six years since the first breach. Id. at 472. Nevertheless, the Court denied the appeal, reasoning:
 absent evidence or expert testimony showing why and how the damages here should have been reduced or discounted to their present value when the damages first began to accrue, neither the court nor the clerk committed reversible error by failing to reduce the damages proven to their value in 1994 before applying the appropriate prejudgment interest rate.
Id. at 473. Without such evidence, the Court "[could not] fault the trial justice or the clerk in failing to perform this calculation on their own." Id. Therefore, prejudgment interest may include interest affixed to future damages when the party seeking a reduced award fails to present evidence in support of his or her argument for such reduction.
Here, Defendants argue that the jury award should be apportioned between past and future damages, and that no interest should be added to the portion compensating for future damages. However, at trial, Defendants failed to present evidence as to what division would be appropriate, nor did they request jury instructions for a separate award of future damages. The jury returned a verdict for Plaintiffs with an undifferentiated award of $500,000 in damages. In assessing interest pursuant to § 9-21-10, it was not for *Page 16 
the Court or the clerk to make the apportionment Defendants now argue was needed, nor would it be within the ministerial function of the clerk to do so. American Courts maintain a "deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary." State v. Lead Indus. Ass'n,898 A.2d 1234, 1238 (R.I. 2006) (quoting Elk Grove Unified School District v.Newdow, 542 U.S. 1, 11 (2004)) (internal quotation marks omitted). Finding adjudication of the due process question raised by Defendants unnecessary based on their failure to offer proof regarding the apportionment of past and future damages at trial, the Court will not address the merits of Defendants' constitutional challenge to the prejudgment interest statute. Accordingly, this Court denies Defendants' Motion to Alter/Amend Judgment.
 IV. Renewed Motion for Judgment as a Matter of Law
Defendants' third and final pending motion is a Renewed Motion for Judgment as a Matter of Law. In passing on a motion for judgment as a matter of law, this Court views all evidence in a light most favorable to the nonmoving party, without assessing its weight or credibility and drawing all reasonable inferences in favor of the nonmoving party.Oliveira v. Jacobson, 846 A.2d 822, 829 (R.I. 2004) (quoting Estate ofFontes v. Salomone, 824 A.2d 433, 437 (R.I. 2003)). "If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion . . . must be denied. . . ."Id.
The Court finds that disputed factual issues remained in this case that could be determined in favor of either party and that Defendants are not entitled to judgment as a matter of law. Dr. Susset testified at length regarding his treatment of Mrs. Youngsaye. In that testimony, he addressed the omissions on which Plaintiffs' allegation of *Page 17 
negligence rested, and Dr. Susset stated that blood tests and tests for kidney function were not indicated when he examined Mrs. Youngsaye. Plaintiffs countered that testimony with the expert testimony of Dr. Gelman, who testified that those omissions were in deviation of the standard of care owed to Mrs. Youngsaye. Dr. Gelman also testified that those omissions proximately caused harm to Mrs. Youngsaye. With Plaintiffs having presented expert testimony on the issues of negligence and causation, as was their burden in a medical malpractice action, this case was appropriate for submission to the jury. The Court finds that the evidence clearly left disputed factual issues for resolution. Therefore, Defendants' Renewed Motion for Judgment as a Matter of Law is denied.
 Conclusion
Having considered three motions pending before the Court, and finding each without merit, the Court hereby denies Defendants' Motion for a New Trial, Motion to Alter/Amend Judgment, and Renewed Motion for Judgment as a Matter of Law.
 Counsel shall submit the appropriate order for entry. *Page 1